THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* FRANK S. HARRIS, JAMES J. McGUINESS and FRANK J. CASSIDY, Defendants.

Supreme Court, Albany County, October 12, 1944.

*George Myers, M. Michel Dobris* and *Robert E. Whalen* for defendants.

*Nathaniel L. Goldstein, Attorney-General* (*George P. Monaghan, Harris P. Steinberg* and *Herbert Stern* of counsel), for plaintiff.

MURRAY, J. Defendants move for an order quashing and setting aside an indictment which charges the crime of conspiracy contrary to the provisions of subdivision 6 of section 580 of the Penal Law.

It is asserted that defendants and other persons committed acts for the perversion and obstruction of due administration of the law by flouting, subverting and refusing to comply with the provisions of section 6 of article I of the Constitution of

the State of New York. It is alleged that defendants corruptly and unlawfully caused Frank J. Cassidy, an unfit and unqualified person and known by them to be such, to be appointed to a position of trust and confidence, to wit, Superintendent of Water Rent Delinquencies of the City of Albany, New York, that defendants committed acts for the perversion and obstruction of justice by obstructing, hindering, interfering with, impeding and attempting to defeat a certain action in the Supreme Court, Albany County, entitled " Nathaniel Goldstein, Attorney-General of the State of New York, Plaintiff, against Frank J. Cassidy, Defendant ", by appointing said Frank J. Cassidy to the office of Water Rent Delinquencies, Water Department, Albany, New York, and that they unlawfully procured the appointment of Frank J. Cassidy to such office.

Defendants' motion to dismiss is based on four separate and distinct grounds as follows: 1. That defendants have been unable to obtain a speedy trial of the indictment; 2. That the evidence taken before the Grand Jury does not show the commission of any crime by defendants in that all of said evidence taken together as such was insufficient, though unexplained or uncontradicted, to warrant a conviction by a trial jury; 3. That the evidence consisted entirely of the uncorroborated testimony of accomplices of the defendants in what is alleged in the indictment to have constituted an unlawful conspiracy; 4. That the Grand Jury was selected and impaneled not by lot as prescribed by section 223 of the Code of Criminal Procedure, but by the arbitrary exclusion of persons duly qualified to serve upon the Grand Jury, and in contravention of the due process clauses of section 6 of article I of the Constitution of the State of New York and section 1 of the Fourteenth Amendment to the Constitution of the United States and also in contravention of the equal protection clauses of section 11 of article I of the Constitution of the State of New York and section 1 of the Fourteenth Amendment to the Constitution of the United States.

The Governor of the State of New York, Hon. Thomas E. Dewey, by order dated November 13, 1943, appointed an Extraordinary Special and Trial Term of the Supreme Court, to be held in and for the County of Albany, to commence on the 13th day of December, 1943, to preside at which he designated Justice Parton Swift of Buffalo. The stated purpose of such term of court was to investigate crime and official corruption in the county of Albany, New York. The Governor further ordered that the Attorney-General, his deputies and assistants, attend such Extraordinary Term. His order also superseded

Mr. John T. Delaney, District Attorney of Albany County, in all matters and proceedings which might come before such Extraordinary Term.

Mayor Erastus Corning, 2d, of Albany, was duly inducted into the armed forces of the United States of America in the present World War. He appointed Frank S. Harris, April 13, 1944, as Acting Mayor during his absence, pursuant to the New York State War Emergency Act. (L. 1942, ch. 445, as amd.) The minutes of the Grand Jury show that Mayor Corning was deeply interested and concerned about the failure of persons to pay their water rents. He urged Acting Mayor Harris to do something about the matter of collecting such delinquent water rents. Mr. Harris testified there had been a good deal of discussion about delinquent water rents. The minutes of the Grand Jury further disclose that before Mayor Corning left Albany to join the United States Army he gave Mr. McGuiness, Corporation Counsel, specific orders to take care of delinquent water rents which had accumulated into serious proportions, to create a bureau for dealing with water rent delinquencies, and to foreclose certain tax liens held by the county under section 79 of the Tax Law. In other words, to collect for the City of Albany the money due it in water rents and taxes.

The City of Albany owns and operates a large and extensive water supply valued at many million dollars. Frank J. Cassidy started to work in 1922 as a foreman or boss plumber in the Water Department of Albany. He continuously remained in such employment and was advanced to Deputy Superintendent, and in January, 1935, appointed Commissioner at a salary of five thousand dollars per annum. Acting Mayor Frank S. Harris' testimony is that he considered the water supply of Albany the most important thing it has for the safety of the city. He believed it necessary and essential to keep Mr. Cassidy to secure his advice and counsel with reference to the water system. The City of Albany has at least ten million dollars invested in its water supply system, and no person understood the details of it as Mr. Cassidy did, in the opinion of Mayor Harris. He believed it would be dangerous for the safety of Albany if the services of Mr. Cassidy were lost, particularly in view of the present manpower shortage.

On April 27, 1944, Mr. Cassidy was subpœnaed to appear before the Grand Jury in connection with the Extraordinary Term. He was asked to sign a waiver of immunity from subsequent prosecution by reason of any testimony he might give.

He declined to do so. On the same day, George P. Monaghan, Esq., Deputy Attorney-General, in charge of the prosecution, wrote Acting Mayor Harris, stating that Mr. Cassidy had refused to sign a waiver of immunity, and called to the Mayor's attention section 6 of article I of the New York State Constitution. Mayor Harris in reply wrote the Attorney-General of the State of New York that he had referred the letter of Mr. Monaghan to Mr. James J. McGuiness, Corporation Counsel of the City of Albany. Mr. McGuiness issued a statement to the press that the City of Albany and its officials were abundantly capable of running the affairs of the City of Albany without assistance from outside sources.

Section 6 of article I of the Constitution of the State of New York provides that if a public officer refuses to sign a waiver of immunity when questioned concerning his official affairs, he *" shall be removed from office by the appropriate authority or shall forfeit his office at the suit of the attorney-general."* (Italics mine.)

Legal action was commenced May 2, 1944, by Attorney-General Goldstein, who prayed for judgment that Mr. Cassidy forfeit and vacate the office of Commissioner of Water and Water Supply of the City of Albany. Answer to the complaint was served by Russell Hunt, Esq., of Albany, who appeared as attorney for Mr. Cassidy. The answer denied on information and belief certain allegations of the complaint, and specifically, that Mr. Cassidy was Commissioner of the Department of Water and Water Supply of the City of Albany. The answer was verified May 22, 1944.

The Board of Estimate and Apportionment of the City of Albany convened for a regular meeting on May 16, 1944, at which time there were present Frank S. Harris, Acting Mayor, Lawrence J. Ehrhardt, Comptroller, James J. McGuiness, Corporation Counsel, and John J. McManus, City Engineer, and among other matters considered was the following resolution offered by Mr. McGuiness:

" RESOLVED, that the position of Superintendent of Water Rent Delinquencies be, and the same is hereby created in the Department of Water and Water Supply, effective May 15, 1944, at an annual salary of Five Thousand Dollars ($5,000.00), and be it

" FURTHER RESOLVED, that the person appointed to the position shall under the direction of the Commissioner of Water and Water Supply, or his deputies, have the duty of compiling a list of delinquent water rents and rates, and formulate and

execute means and method of collecting the same pursuant to the applicable provisions of law.'' The resolution was unanimously adopted. On the 19th day of May, 1944, Mr. Cassidy was appointed Superintendent of Water Rent Delinquencies, Department of Water and Water Supply, Albany, by Andrew V. Kelly, Deputy Commissioner of Water and Water Supply.

It is claimed by the prosecution that from such facts the only reasonable conclusion which can be drawn is that defendants and Andrew V. Kelly, Lawrence J. Ehrhardt, John J. McManus and divers other persons unknown are criminal conspirators. To constitute the crime of conspiracy there must be a corrupt agreement between two or more persons entered into with criminal intent to do an unlawful act, and then, such corrupt agreement must be followed by the doing of such unlawful act. (*People ex rel. Burnham* v. *Flynn,* 114 App. Div. 578, 582, affd. 189 N. Y. 180; *People* v. *Klaw,* 55 Misc. 72, 77.) No evidence of any kind is disclosed in the minutes of the Grand Jury of any corrupt agreement between the defendants or of any criminal intent on their part to do any unlawful act, or that they or any one of them did any unlawful act. The testimony of defendant McGuiness before the Grand Jury that the creation of the office of Superintendent of Water Rent Delinquencies and the appointment of defendant Cassidy thereto had no ulterior purpose, stands wholly uncontradicted.

The contention of the prosecution is erroneous and untenable that the motion to dismiss the indictment should not be entertained by this court, and that it should be referred to the Extraordinary Term. The Extraordinary Term, convened by proclamation of the Governor, became simply a term of the Supreme Court with the same jurisdiction that belongs to any term. (*People ex rel. S. L. & T. Co.* v. *Supreme Court,* 220 N. Y. 487, 492; *Matter of Reynolds* v. *Cropsey,* 241 N. Y. 389, 395, 396; *Saranac Land & Timber Co.* v. *Roberts,* 227 N. Y. 188, 191.) Indictments found at such a term are pending in the Supreme Court, not in any particular term thereof (*Matter of Reynolds* v. *Cropsey, supra,* pp. 397, 398). Referring to the jurisdiction conferred by the Constitution upon the Supreme Court, Mr. Justice HERRICK at General Term in this Department said:

'' That is a provision as to the Supreme Court as a whole. Its jurisdiction is as wide as the boundaries of the State, and every person, natural or artificial, within such boundaries is subject to that jurisdiction.

" For convenience in the transaction of business the State has been divided up into districts, but the court in each district is the Supreme Court of the State, and each has the same power, no more or less than the other; it is the power and jurisdiction of the Supreme Court, not the Supreme Court of the first judicial district, or the fourth judicial district, but the Supreme Court of the State.

" The jurisdiction is given to each and every part of the Supreme Court, each possessing all the power granted to the court; and to confine jurisdiction in certain classes of cases to one part of the court is to deprive the rest of the court of its jurisdiction, or to limit or qualify it. The jurisdiction is general, unlimited and unqualified.  *  *  *

" The suitor also has rights under this section of the Constitution that cannot be taken away from him. He has a right to go into the Supreme Court anywhere for relief. To apply to the court, not to a particular member or territorial division of it. He cannot by legislative enactment be compelled to go before a particular member of it or to a specific county, although the court in the exercise of its power may, in furtherance of justice, subsequently send him there, but he has a right to apply to it for relief wherever within the limits of the State he finds it exercising its functions." (*Mussen* v. *Ausable Granite Works,* 63 Hun 367, 368–369.)

" The Supreme Court is a single tribunal, existing for the purpose of administering the law throughout the State. It performs its functions through many judges in different parts of the State, but its orders, whenever made, are the orders of the court, and are to be respected and enforced as such in all parts of the State and by all branches of the same court." (*People* v. *Murray Hill Bank,* 10 App. Div. 328, 334.)

" The Extraordinary Special and Trial Terms of the Supreme Court convened by the Governor of the State are merely additional to those terms of the court already designated to be held under the provisions of the Judiciary article of the Constitution. The Extraordinary Terms created under the Judiciary Law do not exclude the Special and Trial Terms created by the Constitution from exercising jurisdiction already delegated to such terms.  *  *  *  The court is of the unanimous opinion that the motion to inspect the minutes of the grand jury could be made at any Special Term in the Ninth Judicial District, or at the Extraordinary Term." (*People ex rel. Sherman* v. *Adjourned Special Term,* 206 App. Div. 799.)

Moreover, it appears from the records of this court that on September 28th, Mr. Justice Swift recessed the Extraordinary Term to October 11th.

" A recess of a term of court decisively and inevitably indicates a temporary suspension of its proceedings." (*Matter of Reynolds* v. *Cropsey, supra,* at p. 400.) Thus, it was all the more appropriate that the pending motion be heard at this time and place. (*People ex rel. Newton* v. *Special Term, Part 1,* 193 App. Div. 463, 472.)

No person other than defendants and members of the Board of Estimate and Apportionment, Lawrence J. Ehrhardt, John J. McManus, John J. Murray and Andrew V. Kelly, Deputy Commissioner of Water and Water Supply, gave testimony before the Grand Jury. If the theory of the prosecution is accepted as true, all were accomplices. Their testimony is not corroborated by that of another accomplice. The testimony of accomplices does not fulfill the requirements of the statute. (*People* v. *O'Farrell,* 175 N. Y. 323; *People* v. *Dally,* 174 Misc. 830.) It is well settled that corroboration of an accomplice or accomplices is necessary to the finding of a valid indictment by a grand jury and, in the absence of corroboration, the indictment must be dismissed. (Code Crim. Pro., § 399; *People* v. *Sweeney,* 213 N. Y. 37.)

Defendants pleaded "not guilty" June 2, 1944, when arraigned before Justice Swift. No bail was asked either from Mr. Harris or Mr. McGuiness. The court paroled them in custody of counsel, Mr. Robert E. Whalen, but required Mr. Cassidy to furnish bail in the sum of $2,500. Eight weeks after the indictment was returned, on July 28, 1944, counsel for defendants requested Justice Swift to fix a date for the trial of defendants. The record discloses that Justice Swift made no reply to Mr. Whalen, but asked Mr. Monaghan if he could set a date, to which Mr. Monaghan replied: " Not at this time, but I will assure Mr. Whalen that he will be accorded a speedy trial. I will set a date in the near future." Mr. Whalen replied that such arrangement was satisfactory to him.

After the expiration of six weeks, on September 7, 1944, Mr. Whalen appeared again at the Extraordinary Term, where he renewed his application to Justice Swift for early trial of the indictment. Mr. Monaghan opposed the motion, stating his belief that the ends of justice would be better served if these cases were not tried during the political campaign. Mr. Monaghan stated that in due course, and at an early date, defendants would secure a trial when they could be tried on the merits.

Mr. Whalen replied: " We are ready at any time. We prefer to bring the cases to trial. It is fourteen weeks since the indictments were found." Justice SWIFT remarked about " vacation time ". When counsel for defendants insisted they were entitled to a speedy trial, both under the Criminal Code and under the Bill of Rights, Mr. Monaghan then stated to the court that the application of defendants for trial was not made in good faith. Justice SWIFT remarked: " Well, I cannot set a date just at present. But, you will get one. I assure you at an early date." Notwithstanding this statement, the court then excused all trial jurors until October 23, 1944.

The importance and necessity of enforcement of the constitutional right of a defendant to a speedy trial in a criminal action cannot be stated with greater emphasis or accuracy than is done by Judge THOMAS M. COOLEY in his concededly great legal treatise, " Constitutional Limitations ". There he writes as follows (8th ed., Vol. 1, p. 646): " In this country, where officers are specially appointed or elected to represent the people in these prosecutions, their position gives them an immense power for oppression; and it is to be feared they do not always sufficiently appreciate the responsibility, and wield the power with due regard to the legal rights and privileges of the accused. When a person charged with crime is willing to proceed at once to trial, no delay on the part of the prosecution is reasonable, except only that which is necessary for proper preparation and to secure the attendance of witnesses."

The framers of the Federal Constitution and the Constitution of the State of New York did not indulge in the use of metaphor or figure of speech when they wrote the word " speedy ". Webster (2d ed.) defines the word speed as — " to make haste ", " to hurry ", " to move with celerity ". The mandate of the Constitution is positive, direct and stands without qualification or equivocation.

The Extraordinary Term was in session through the summer months of 1944. The constitutional right of defendants to speedy trial was disregarded. The remedy provided in event of denial of speedy trial is that defendants are entitled under section 668 of the Code of Criminal Procedure to move for an order that the indictment against them be dismissed. Unquestionably, defendants have been thwarted in their efforts to obtain an early trial. (*Matter of Klein,* 17 Misc. 107.) It is no answer to say that two have been paroled in the custody of their counsel while the third is at large on bail, since they are still constructively in the custody of the law. (*People ex rel. Wolfe*

v. *Johnson,* 230 N. Y. 256, 259; *Matter of People [Lexington S. & I. Co.]*, 272 N. Y. 210, 213.)

The evidence before the Grand Jury, taken together, was not such, even if unexplained or uncontradicted, as would warrant a conviction of defendants of the crime of conspiracy by a trial jury. A defendant is presumed innocent until the contrary prevails, just as much in the grand jury room as elsewhere. The evidence must be of such weight as to clearly overcome the presumption of innocence before an indictment can properly be found. The test is: Is the defendant's guilt satisfactorily shown, prima facie, beyond any reasonable doubt? (Code Crim. Pro., § 389; *People* v. *Gresser,* 124 N. Y. S. 581; *People* v. *Frazer,* 201 N. Y. S. 75.) Speculation, surmise and suspicion are insufficient. (*People* v. *Sacks,* 276 N. Y. 321.)

The Board of Estimate and Apportionment of the City of Albany duly created the position of Superintendent of Water Rent Delinquencies, and such Board of Estimate and Apportionment of Albany — a second class city — had the legal right and power to create such position of Superintendent of Water Rent Delinquencies of the Water Department of Albany and to fix the salary of same.

" The board of estimate and apportionment, except as otherwise provided by law, shall have authority to fix the salaries or compensation, and determine the positions and numbers of all city officers and employees, of each office, board and department, but the salary or compensation of every officer and employee shall be thus fixed before his election or appointment, except in the first instance after the city shall have become a city of the second class and subject to the provisions of this chapter." (Second Class Cities Law, § 74.)

When Mr. Cassidy accepted the position of Superintendent of Water Rent Delinquencies, *ipso facto,* the office of Commissioner of Water Supply held by him thereby became vacant. The purpose or result of the action of Mr. Goldstein, to have Mr. Cassidy vacate the office of Commissioner of Department of Water and Water Supply of the City of Albany, was fulfilled. That for which judgment was asked came to pass. How by any action on the part of defendants they obstructed, impeded or defeated the purpose of Mr. Goldstein's lawsuit, this court is unable to discern. Mr. Cassidy had a legal right to accept employment as Superintendent of Water Rent Delinquencies. There is no law and none has been submitted by counsel for the prosecution or any decision of the courts which prohibited the City of Albany from hiring Mr. Cassidy as Superintendent of Water Rent

Delinquencies. It is familiar law that plaintiffs may not secure damages from parties who do what they have a legal right to do. (*Beardsley* v. *Kilmer,* 236 N. Y. 80; *Auburn and Cato Plank Road Co.* against *Douglass,* 9 N. Y. 444.)

The constitutional provision which the prosecution claims Mr. Cassidy violated contains nothing in any way, shape or form to the effect that once a person is removed from public office, or a judgment is obtained against him that he forfeit and vacate a public office held by him, he is thereby barred from further public employment.

The theory of the prosecution, that because the Board of Estimate and Apportionment of the City of Albany created the position of Superintendent of Water Rent Delinquencies, the members of such Board thereby committed a criminal act, is fantastic, absurd, and without support or justification. The meeting of the Board was open to the public. There is not a suggestion in the testimony or evidence or in the record that the resolution adopted was passed in secret session or that anything was done by any of the officials of Albany in a secretive or furtive manner. The record demonstrates that every act done by the alleged participants of the alleged conspiracy was done above board and in an open manner. Scrutinize sharply as one may the minutes of the Grand Jury and all the evidence in the record, nowhere can there be found a scintilla of evidence showing any corrupt or unlawful agreement upon the part of defendants to do any illegal act. Defendants are public officials. Every act performed by them was for a lawful purpose to fulfill their duties as public officials of the City of Albany, and there is nothing in the record to support any contrary finding.

To justify indictment of defendants, the evidence had to be of such weight, consistency and value as to exclude to a moral certainty every reasonable hypothesis of innocence, and such that the inference of guilt must be the only inference that could reasonably be drawn from the evidence. (*People* v. *Razezicz,* 206 N. Y. 249; *People* v. *Mantin,* 184 App. Div. 767.) When the evidence is capable of an interpretation which makes it equally as consistent with innocence as guilt, that meaning must be ascribed to it which accords with innocence. It can only be so established by proof of such circumstances as are irreconcilable with any other theory than the guilt of the person accused. (*Shotwell* v. *Dixon,* 163 N. Y. 43, 52.)

Applying the law to the facts, the evidence before the Grand Jury was obviously insufficient to warrant indictment. It was not such as to exclude every hypothesis of innocence and point

only to the guilt of defendants. (*People* v. *Frazer,* 201 N. Y. S. 75, *supra.*) Guilt of defendants was not shown beyond a reasonable doubt. A criminal statute should be narrowly construed. Acts otherwise innocent and lawful do not become criminal unless there is clear and positive expression of the legislative intent to make them criminal. (*People* v. *Phyfe,* 136 N. Y. 554, 559; *People* v. *Benc,* 288 N. Y. 318, 322; *People* v. *Fein,* 292 N. Y. 10, 14.)

The indictment against defendants was not found by a legally formed Grand Jury. The institution of the grand jury is designed as a barrier between the liberty of a person and the tyranny of the executive. The constitutional guarantee is explicit: " No person shall be held to answer for a capital or otherwise infamous crime   *   *   *   unless on indictment of a grand jury ". (N. Y. Const. [Bill of Rights], art. I, § 6.) A grand jury is defined by section 223 of the Code of Criminal Procedure, as follows: " A grand jury is a body of persons, returned at stated periods, from the citizens of the county, before a court of competent jurisdiction, *and chosen by lot,* and sworn to inquire of crimes committed or triable in the county." (Italics mine.) The grand jury dates back to an early period in the history of England. It is formed for the purpose of making investigations and accusations of crime. For many centuries it has been regarded as a security to the individual of his rights and as preventing persecution in the name of the King. Its object is to prevent unjust and unlawful prosecution of the individual in the name of the public. The Constitutions of the United States and the State of New York show that it was adopted as a means of protection to the citizens as well as a necessary aid to public justice. (*People* v. *Naughton,* 7 Abb. Pr. N. S. 421.)

It is the duty of the courts to see to it that an accused person enjoy the protection guaranteed to him by the Constitution. No person shall be deprived of his life, liberty or property without due process of law. (N. Y. Const., art. I, § 6; *Matter of Buchanan,* 146 N. Y. 264, 271.) A grand jury constituted in any other manner than as prescribed by law is without legal warrant.

With respect to the selection of a grand jury, the necessity of following the law is well stated in *People* v. *Brodlowicz* (182 Misc. 351, 357) as follows: " Most litigants are willing to abide by the verdict of a jury of their peers, drawn by lot from among the persons of their community. The Legislature of the State   *   *   *   has attempted to provide a means of assuring that jurors are drawn by lot. Any innovations or local practices,

experimentations or attempts at improvement in the manner of selecting jurors by individual judges can lead only to suspicion and uncertainty in the minds of litigants.''

The history of the grand jury and the decisions of the courts show conclusively that the basic and fundamental requirement in selecting a grand jury is that it shall be drawn by lot.

'' In a free and popular government, it is of the utmost importance to the peace and harmony of society, not only that the administration of justice and the punishment of crimes should in fact be impartial, but that it should be so conducted as to inspire a general confidence, and that it will and must be so. To accomplish this, nothing could be better contrived than a selection of a body, considerably numerous, *by lot,* from amongst those, who previously and without regard to time, person, or occasion, have been selected from among their fellow-citizens, as persons deemed worthy of this high trust by their moral worth, and general respectability of character.'' (Chief Justice SHAW, of Massachusetts, in a charge made by him to a grand jury, quoted in 8 Am. Jurist 216, 217 [1832].) (Italics mine.)

Of the action of a court in excusing on its own motion certain grand jurors and substituting other qualified persons in their stead, it is stated as follows: '' This action, however, is open to severe criticism and such a practice, should not be permitted to continue. If upheld, it places within the power of the court the ability to so mold the grand jury that it may be deprived of its independence of action. The statutes and the common law prescribe the way in which a grand jury shall be constituted and what shall disqualify any person from acting as a grand juror, and it would seem that where there is no statute giving the court the power on its own motion to remove persons who are duly qualified in order to substitute others, such an act is done without warrant of law, and a grand jury thus made up is illegally constituted.'' (Edwards on The Grand Jury, p. 83.)

It is the duty of a prosecuting attorney to treat an accused person with judicial fairness. It is just as much his obligation to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. (*Berger* v. *United States,* 295 U. S. 78.)

It has been well stated that:

'' The history of our grand jury system is one of great nobility and of service, of protection to the humble from the unwarranted accusations of the great and mighty. For a thousand years it has been in the process of magnificent development — a shield to the innocent, a sword to the guilty.

" No king, no emperor, ever successfully controlled its determinations, and throughout the centuries it has protected the oppressed." (*Matter of Healy,* 161 Misc. 582, 599.)

A grand jury was duly and regularly drawn by the officials of Albany County for service at the Extraordinary Term. When called for duty the Attorney-General and his representatives decided to impanel a grand jury, not as drawn by lot from the jury box by the designated officials of Albany County, but one suitable to them. To achieve such result, a method illegal and contrary to law was adopted with the approval of the Trial Justice. A policy of exclusion was followed which was wrong, even if it be conceded that it was done under the mistaken notion of duty. Any practice of allowing a district attorney or other prosecuting officer to select a grand juror he deems suitable is an error fundamental and jurisdictional. It is not a mere irregularity. There can be only one grand jury; the formation of it is specifically regulated by statute. If a body of persons is organized into a grand jury without authority of law, it is not a legal grand jury.

The claim of defendants that they were indicted by an illegally constituted grand jury is fully sustained by the record. A clear understanding of the question as to the invalidity of the indict- ment requires a full statement of the facts and law in relation to the formation of the Grand Jury. They are as follows:

When the Extraordinary Term convened on December 20, 1943, one William J. Shea, who had been held for the Grand Jury, appeared, pursuant to section 237 of the Code of Criminal Procedure, by Reuben Kohn, Esq., as his attorney, and later by Daniel H. Prior, Esq., of counsel. The impaneling of the Grand Jury occupied twelve days, beginning on December 20, 1943, and ending on February 7, 1944. In that interval, 8 panels of 36 each, totaling 288, were summoned to appear as grand jurors, many of whom were excused from service on the day when their summons was returnable. There remained in all 126 who were examined on the *voir dire* under oath.

On the first day of such examinations, and on the return day of each subsequent summons, the prosecutor for the People produced a nine-page list of some 250 to 300 residents of Albany County. (People's Exhibit 3 for Identification.) To each prospective grand juror a copy of that nine-page list was submitted, and he was required, while on the stand, to indicate by a check mark thereon each person known to him among those so listed. Even if slightly acquainted, or if he had dealt with any of those on the list in any way, directly or indirectly, the juror

was required so to indicate by a check mark. Every request by counsel for Shea for permission to examine the nine-page list was met with a refusal by the prosecutor, Mr. Monaghan, whose refusal in each instance the court sustained. It was stated in the hearing of the grand jurors that " evidence will undoubtedly be offered before the Grand Jury " against those whose names appeared in the nine-page list. People's Exhibit 3 for Identification was never introduced in evidence.

Section 239 of the Code of Criminal Procedure provides six causes for challenge to an individual grand juror, the first five of which are immaterial here, so that we are concerned only with the sixth: " That a state of mind exists on his part in reference to the case or to either party, which satisfies the court, in the exercise of a sound discretion that he can not act impartially and without prejudice to the substantial rights of the party challenging." *That subdivision was designed " in the particular and special interest of the person accused "*, section 238 having been enacted " in the general interest of public justice " (*The People v. Hooghkerk*, 96 N. Y. 149, 159). (Italics mine.)

A challenge to an individual grand juror must be tried by the court in the same manner as challenges in the case of a trial juror. (Code Crim. Pro., § 240). The only ground for challenge of a trial juror for actual bias is prescribed in the first sentence of subdivision 2 of section 376 of the Code of Criminal Procedure, the language of which is practically identical with that of subdivision 6 of section 239, above quoted. But the second sentence of section 376 provides that a present opinion or impression on the part of a juror: " * * * is not a sufficient ground of challenge for actual bias, to any person otherwise legally qualified, if he declare on oath, that he believes that such opinion or impression will not influence his verdict, and that he can render an impartial verdict according to the evidence, and the court is satisfied, that he does not entertain such a present opinion or impression as would influence his verdict." In a challenge for actual bias, the cause stated in subdivision 2 of section 376 must be alleged. (Code Crim. Pro., § 380.) If the facts asserted as ground of challenge for actual bias be denied, the challenge must be tried by the court (Code Crim. Pro., § 382); the challenged juror may be examined as a witness to prove or disprove the challenge (§ 383); the rules of evidence applicable to the trial of other issues govern the trial of the challenge (§ 384); and the court, in trying the issue of fact raised by such a challenge, is not bound by the juror's declaration, but may act " ' from observation of the appearance of the juror, his

age, intelligence, his manner on the stand, and his answers to questions ' '' (*Balbo* v. *The People,* 80 N. Y. 484, 492, 495).

Not until the process of impaneling the Grand Jury was about half completed was any challenge interposed by Mr. Monaghan and tried, but on the suggestion of him that they be excused " The court summarily discharged grand jurors without challenge, for any of the causes set forth in the Code of Criminal Procedure, section 239, or without trial thereof ", as was pointed out by the minority of the Court of Appeals in *Matter of Shea* v. *Swift* (292 N. Y. 116, 120), a proceeding instituted by Shea for an order, analogous to a writ of prohibition, which was held by the majority of the court not to lie, since the Extraordinary Term had jurisdiction of the case.

Up to the time when Shea sought prohibition, some two score jurors had been eliminated from service on Mr. Monaghan's bare contention that they were " subject to bias " or " tending to bias ", or upon his suggestion that they request the court to be excused. After the decision of the Court of Appeals in the *Shea* case (*supra*), however, twenty-five jurors were successfully challenged by the prosecutor " under subdivision 6 of section 239 of the Code ", but without any specific statement of fact constituting the cause of challenge, as required by section 380 of the Code of Criminal Procedure. *In every instance where jurors declared on their oaths their ability to act impartially and in accordance with the court's instruction, the jurors, more than twenty in number, were barred.* While the *Balbo* case (*supra*) holds that a determination of questions of fact on the trial of a challenge is peculiarly for the court, it is difficult to understand why the sworn statements of jurors as to their freedom from prejudice should have been invariably disregarded. Other grounds of challenge successfully interposed by Mr. Monaghan were his assertion, of undisclosed knowledge on his part " where the investigation might lead "; " because of facts that exist or may exist "; " because of juror's acquaintance with certain persons on the nine-page list, some of whom may be involved in the investigation ", or " may figure in the investigation in one way or another." Thus, the whole course of the procedure followed during the twelve days consumed in the impaneling of twenty-three grand jurors affords reasonable ground for speculation and surmise as to whether acquaintance with persons on the nine-page list was but a cunningly contrived device to eliminate prospective jurors from service until, by the process of exclusion, a panel, selected not by lot but in accordance with pros-

ecutor's predilections, had been obtained. Chance or accident can hardly account for the persistent omission of certain types of citizens from the list of those permitted to serve as grand jurors. (*Smith* v. *Texas*, 311 U. S. 128, 131; *Hill* v. *Texas*, 316 U. S. 400, 404.) Nothing is more abhorrent to our American ideas of justice than suspicion that a jury, grand or petit, has been hand-picked or packed. The fact that grand jurors have been drawn from the mass of the people by lot has given stability and continuity to the grand jury system without which it cannot survive. The validity of an indictment may be attacked by motion to quash (*People* v. *Dimick*, 107 N. Y. 13, 34), which may be made at any time (*People* v. *Winner*, 80 Hun 130, 134), and on such a motion irregularity or error in the finding of the indictment may be established by extrinsic evidence (*People* v. *Glen*, 173 N. Y. 395, 400).

It was apparently the contention of the prosecution that personal acquaintance with those named in the nine-page list afforded a doubt of fitness for service on the Grand Jury; but the Supreme Court has said: " The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." (*Strauder* v. *West Virginia*, 100 U. S. 303, 308.) The same court has said:

" Principles which forbid discrimination in the selection of Petit Juries also govern the selection of Grand Juries." (*Pierre* v. *Louisiana*, 306 U. S. 354, 362.)

" Indictment by Grand Jury and trial by jury cease to harmonize with our traditional concepts of justice at the very moment particular groups * * * — otherwise qualified to serve as jurors in a community — are excluded as such from jury service." (*Pierre* v. *Louisiana, supra*, p. 358.)

" It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." (*Smith* v. *Texas, supra*, p. 130.)

Were a judge to have a free hand in the impaneling of grand jurors, he could convert the grand jury from a distinct and independent body into a mere dependency of the court, chosen by his will, a power destructive of the purity and independence of the grand jury and tending to pervert it from all the purposes of its institution. (*Finley* v. *The State*, 61 Ala. 201, 207.) Where a Maryland statute required that only the judge should select from the tax list and the poll books 200 names to be placed in the

box, from which 48 were to be drawn to serve as jurors, but the judge made up his list of 200 from names suggested to him privately by various persons, the court said: " If the practice pursued in this case were tolerated, it is not difficult to foretell its widespread and disastrous consequences. Designing or interested parties, or others at their instance, might with ease impose upon a Judge by privately suggesting the names of persons unfit to be jurors; but, what is still more to be dreaded, they might, by the same means, secure for their own sinister ends an absolute dominion and control over the jury. It would be a lasting reproach to the administration of justice if the courts sanctioned any construction of this statute which would afford the slightest opportunity for the cunning, the crafty, and the unscrupulous to secure the selection of  *  *  * a pliable jury  *  *  *.  *  *  *

" As the grand jury were not selected and drawn according to law, the presentment and indictment found by them against the appellant were absolutely null." (*Avirett* v. *State,* 76 Md. 510, 536, 538.)

If a judge be allowed to excuse or discharge without good cause a member of the Grand Jury drawn as prescribed by law, then he may excuse any number and thereby choose a grand jury of his own liking. (*State* v. *Smith,* 145 La. 1091, 1098.) If a judge may discharge one member of the Grand Jury without cause, he may, with equal propriety, discharge any number on his own mere motion, although any such course would be contrary to the spirit of the laws regulating the organization of juries. (*Portis* v. *The State of Mississippi,* 23 Miss. 578, 582, 583.)

On the question whether an indictment should be found: " If evidence is therefore to be heard, it is wiser that it be heard and considered by a body impartially selected from the people, than by a single officer whose training would incline him to find those grounds upon which the prosecution might be sustained." (Edwards on The Grand Jury, p. 36.)

It is the duty of the courts, as well as that of the State, to see to it that throughout the procedure for bringing an accused person to justice he shall enjoy the protection guaranteed to him by the Constitution; and where timely objection has laid bare a discrimination in the selection of grand jurors, a prosecution initiated by that body cannot stand. (*Hill* v. *Texas,* 316 U. S. 400, *supra.*)

" Where a person is accused of an offense, he has a right to take advantage of every irregularity in the proceedings on the

part of the officers appointed to administer the law, of their personal disqualifications, and of the personal disqualifications of the grand jurors, providing he does so at the proper time." (Edwards on The Grand Jury, p. 64.)

Since noncompliance with a fundamental requisite in the creation of a grand jury vitiates an indictment returned by it (*Dunn* v. *United States,* 238 F. 508, 512), defendants are clearly entitled, on that ground alone, to a dismissal of the indictment against them. (*The State* v. *Brooks,* 9 Ala. 9, 13; *State of Oregon* v. *Lawrence,* 12 Ore. 297, 300.)

One further matter remains for comment and that is the unusual practice adopted by the court in excluding all persons from the court room while he delivered his charge to the Grand Jury. The record is as follows: " The Court: All those who are not on this panel will please step out." (Typewritten Minutes; Examination of Grand Jurors, at p. 1075.) All spectators thereupon left the room. After the Grand Jury was sworn, the court delivered his charge.

Subdivision 1 of section 8 of the Code of Criminal Procedure declares a defendant in a criminal action is not only entitled to a speedy trial, *but a public trial.* This law has its foundation in the Bill of Rights. It is a constitutional right involving the question of jurisdiction and cannot be waived.

" A public fundamental right, the exercise of which is requisite to jurisdiction * * * cannot be disregarded " (*People ex rel. Battista* v. *Christian,* 249 N. Y. 314, 318).

" The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused * *. * " (1 Cooley on Constitutional Limitations [8th ed.], p. 647). No reason or purpose is disclosed why the public were excluded from the court room. Why a mantle of mystery and secrecy was thrown about the court room and around the charge of Justice SWIFT is unexplainable, unless done for psychological effect. There is nothing in the record that the order of exclusion of the public was to promote sanitary conditions or public morals or public decency.

The evidence presented to the Grand Jury was insufficient to clearly overcome the presumption of innocence surrounding

defendants. There was no proof that defendants committed any crime whatever. The indictment is void and wholly invalid, having been returned by a body of persons illegally and improperly impaneled as a Grand Jury.

For the reasons herein stated, the motion of defendants for an order to quash and dismiss the indictment is granted. Indictment dismissed. Submit order.