COMMONWEALTH vs. HARRY SHUMAN.

Middlesex.  September 15, 1983. — March 6, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Conspiracy. Entrapment. Insurance,* Defrauding insurer.

Evidence at the trial of an indictment charging conspiracy to defraud an
insurer was sufficient to warrant a finding that the defendant, an at-
torney, had conspired with a physician to submit false personal injury
claims on behalf of two undercover police officers who had staged an
automobile accident. [346-350]

The defense of entrapment should be raised at the trial of a criminal case,
rather than by a pretrial motion to dismiss. [351-352]

In criminal proceedings against an attorney indicted for conspiring with a
physician to defraud an insurer as a result of the attorney's submission
of false personal injury claims on behalf of two undercover police of-
ficers who had staged an automobile accident, the evidence did not
support the defendant's claim that he "was entrapped as a matter of
law." [350-353]

The conduct of undercover police officers who had staged an automobile
accident, filed falsified documents with the Registry of Motor Vehicles
and in court, and, under assumed names, visited a physician and an
attorney in order to uncover insurance fraud was not so egregious as to
bar prosecution of the attorney for conspiring with the physician to
defraud an insurer following the attorney's submission of false per-
sonal injury claims on behalf of the police officers. [353-355]

INDICTMENT found and returned in the Superior Court
Department on February 12, 1980.

A motion to dismiss was heard by *Young,* J., and the case
was tried before *Linscott,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Willie J. Davis (Steven J. Rappaport* with him) for the de-
fendant.

*Margot Botsford,* Assistant District Attorney *(Patricia A.
McEvoy,* Assistant District Attorney, with her) for the
Commonwealth.

O'CONNOR, J.  The defendant, an attorney, appeals from his conviction of conspiracy with Morton Swartz,[1] a physician, to steal money of the value of more than one hundred dollars by defrauding an insurance company.  He argues that there was insufficient evidence of his guilt, that he was entrapped, and that the conduct of police undercover agents in staging an automobile accident and filing falsified documents denied him his right to due process of law.

Before trial the defendant moved for a dismissal of the indictment, asserting entrapment and, as a second ground, that police conduct had been "so offensive to fair play that due process principles bar[red] invoking the judicial process to obtain a conviction."  The motion to dismiss was denied after an evidentiary hearing.  The case was subsequently tried before another judge without a jury.  The defendant moved for a required finding of not guilty at the close of the Commonwealth's case.  That motion was denied.  The judge found the defendant guilty and sentenced him to two years in a house of correction, with the sentence being suspended for two years.  A stay of execution of sentence pending appeal was allowed.  The defendant appealed the conviction, following which the motion judge filed a memorandum of decision relative to the previously denied motion to dismiss.  The memorandum included findings.  We granted direct appellate review.  We affirm the conviction.

The following evidence was introduced at trial.  After a discussion with his commanding officer concerning suspected automobile insurance fraud, State police Trooper Richard Barrett obtained two automobiles with money he had received from the State police insurance crime prevention unit.  He registered them with fictitious names, insured them under those names, and staged an accident at the Framingham State police barracks on February 14, 1979.  Barrett caused the front of one car to collide with the rear of the other car.

---

[1] The only appeal before this court is that of the defendant Shuman.

Barrett then entered this "accident" in a State police log as an actual occurrence. He completed and filed an accident report which stated that an automobile, containing a driver and a passenger, had been struck from behind in an accident occurring at the intersection of Routes 126 and 9 in Framingham. No injuries were listed on the accident report. The stated name of the driver was Richard J. Barry, and that of the passenger was Thomas Sullivan. The names were fictitious. Barrett then "issued" a citation to Carlos Orantes, the fictitious owner and operator of the second automobile. This citation was filed in the Framingham Division of the District Court. The court was not informed of the trooper's investigation, and Barrett later paid the fine for the citation. Stating that he was Carlos Orantes, Barrett reported the accident to Aetna Insurance Company, with whom he had insured the second automobile in Carlos Orantes' name.

Later that day, Barrett telephoned Dr. Swartz stating that he was "Rich" Barry and that he had just had an accident and that he thought Swartz could help him out. Barret described the accident, and Swartz replied, "Now, listen, this is what happened. When you were struck from behind, that caused you to go forward and hit your chest on the steering wheel which caused your neck to go back and snap. You also hurt your shoulders, your back, and your knees." Barrett laughed, and Swartz warned him that unless his expenses exceeded $500, his recovery would be minimal. Swartz also advised Barrett to take some time off from work because "it makes it look better on the claim." Swartz stated that he would put Barrett and Thomas Sullivan, the fictitious injured passenger, in touch "with an attorney friend of his," and made an appointment to see Barrett and Sullivan in the morning. Swartz told Barrett to recite his injuries to Swartz, to be certain that Barrett would know what to say, "in case [he was] asked."

The next day, Barrett, posing as Richard Barry, and Trooper Thomas Summers, posing as his passenger, went to see Swartz at his office. Without physically examining

either Barrett or Summers, Swartz made an appointment
with another doctor for X-rays that afternoon and explained
again that under the no-fault insurance law, medical ex-
penses have to exceed $500 to obtain a worthwhile recovery.
Swartz then telephoned the defendant's office and made an
appointment with him for Barry and Sullivan. That was
the first time that the troopers had heard of the defendant
Shuman.

On February 17, 1979, Barrett and Summers went to the
defendant's law office. The defendant said, "I understand
you were in a car accident. What are your injuries?" The
troopers laughed and said that the defendant would have to
call Swartz to find out. The defendant approved of
Swartz's advice that they stay out of work, and when Bar-
rett told the defendant that they already had had X-rays
taken, the defendant stated, "Good. Leave it to Morty
[Swartz] to cover all the bases." Before inquiring about
Barrett's and Summers' injuries or talking to Swartz, the de-
fendant stated that Barrett and Summers should see special-
ists. He said that one of them should see a neurologist and
the other should see an "orthopedic man," in order to have
expenses which would exceed $500. The defendant then
telephoned Swartz and told him that he wanted Barrett and
Summers to see two specialists.

The defendant gave Barrett the name of a neurologist and
informed Barrett that he had hit his head on the windshield
and was having headaches. Barrett denied this, and the de-
fendant repeated his instructions. When Barrett asked if
the specialist would know that he was lying, the defendant
stated, "Don't worry about that. He plays the game." The
defendant gave Summers the name of an orthopedic special-
ist who, he said, "plays the game too." As the troopers were
leaving, the defendant stated that they would each get be-
tween two and three thousand dollars, and that "[h]ypo-
thetically, what will happen is you will be seeing the doctor
— Dr. Swartz — about twenty times in the next two or
three months. But don't worry about that. It's only on
paper. You don't really have to go see him." The defend-

ant explained that these fictitious visits would inflate their medical expenses.

After this visit, Barrett made two visits to the neurologist recommended by the defendant. Barrett later spoke with the defendant, who complained that there had been a "mess-up" with Summers' visit to his specialist because Summers had not informed the specialist of any ailments. Summers had in fact been to see the orthopedic specialist suggested by the defendant. At the defendant's request, Summers returned to the defendant's office on May 15, 1979. The defendant showed Summers a copy of the medical report prepared by the orthopedic specialist and mailed to the defendant. The defendant stated that he would have to "bury" this report because it was a "bad" report in that it said that there was nothing wrong with Summers. The defendant repeated that it was imperative to exceed $500 in medical expenses and that Summers must go to another specialist to achieve this goal. The defendant telephoned Swartz and said, "Hello Morty, I have Tom Sullivan here. I just received a bad report from [the orthopedic specialist]. We have to get him to another specialist who plays the game." After this conversation, the defendant told Summers to see another specialist and "to play the game straight." He then told Summers to remember that Summers had suffered from neck and knee injuries and that he should tell the specialist that he had seen Dr. Swartz approximately twenty times. In fact, Summers had only seen Swartz on one occasion. Summers later saw the second specialist on two occasions.

On February 8, 1980, Barrett returned to the defendant's office and, pursuant to a search warrant, seized the files relating to "Barry" and "Sullivan." A search of these files revealed bills from each of the specialists concerning the visits of Barrett and Summers. Also included were bills from Swartz indicating thirteen visits from Barrett. In fact, Barrett had only been to see Swartz on one of these dates.

The files of the Aetna Casualty Insurance Company, which insured the vehicle that collided with Barrett and

Summers' automobile, indicated that the defendant filed a letter of representation concerning the claims of "Barry" and "Sullivan." The defendant made a settlement demand for "Barry" and "Sullivan" to Aetna's claim representative, after describing the bills for their visits to Swartz and the various specialists. The figures listed for these visits to Swartz included the fictitious visits that were never made by Barrett or Summers.

The defendant's argument to the trial judge in support of his motion for a required finding of not guilty was that insufficient evidence had been introduced to warrant a finding of conspiracy between the defendant and the physician, Swartz. The defendant makes that argument here as well. The argument has no merit. "[A] motion for [a required finding of not guilty] should be denied 'if all the circumstances including inferences [that are not too remote according to the usual course of events] are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 (1979). We consider the evidence "in its light most favorable to the Commonwealth," *Commonwealth* v. *Dunphy*, 377 Mass. 453, 456 (1979). Keeping in mind that the usual mode of proving a conspiracy is by circumstantial evidence, and that "[t]he acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object . . . may be satisfactory proof of a conspiracy," *Commonwealth* v. *Nelson*, 370 Mass. 192, 200-201 (1976), quoting *Commonwealth* v. *Smith*, 163 Mass. 411, 418 (1895), it is clear that the evidence we have set forth amply warranted a finding of conspiracy.

Next, we consider the defendant's argument that he "was entrapped as a matter of law." The doctrine of entrapment has been stated this way: "It is socially desirable for criminals to be apprehended and brought to justice and there is nothing whatever wrong or out of place in setting traps to catch those bent on crime; [but] the state cannot tolerate . . .

having its officers, who are charged with the duty of enforc-
ing the law, instigate crime by implanting criminal ideas in
innocent minds and thereby bringing about offenses that
otherwise would never have been perpetrated." R. Perkins,
Criminal Law 1031 (2d ed. 1969). "Artifice and stratagem
may be employed," *Commonwealth* v. *Harvard,* 356 Mass.
452, 459 (1969), and nevertheless "no entrapment exists 'if
the accused is ready and willing to commit the crime when-
ever the opportunity might be afforded,'" *Commonwealth*
v. *Miller,* 361 Mass. 644, 651 (1972), quoting *United States*
v. *Groessel,* 440 F.2d 602, 605 (5th Cir.), cert. denied, 403
U.S. 933 (1971). Also, the issue presented when the defense
of entrapment is asserted is not whether the particular of-
fense was brought about by the government agent, but
rather whether the government agent brought about the de-
fendant's predisposition to crime. *Commonwealth* v. *Har-
vard, supra* at 460.

"The defense of entrapment is appropriately raised . . .
by the introduction of some evidence of inducement by a
government agent or one acting at his direction. Mere evi-
dence of solicitation is not enough to show inducement, but
little more than solicitation is required to raise the issue.
'[A]ny evidence . . . that the government agents went
beyond a simple request and pleaded or argued with the de-
fendant, should be enough.' *Kadis* v. *United States,* 373
F.2d 370, 374 (1st Cir. [1967]). When evidence of induce-
ment has been entered, the burden rests upon the Common-
wealth to prove beyond a reasonable doubt the predisposi-
tion of the defendant to commit the crime. . . . The jury [or
judge in a jury-waived trial] may . . . properly consider the
conduct of the defendant as related to the indictments at
issue . . . and predisposition may warrantably be found
upon this kind of evidence alone, if the evidence is of suffi-
cient significance." *Commonwealth* v. *Miller, supra* at
651-652. See also *Commonwealth* v. *Thompson,* 382 Mass.
379, 383-386 (1981).

We have recognized entrapment as a defense that may be
presented at trial. See *Commonwealth* v. *Thompson, supra;*

*Commonwealth* v. *Miller, supra; Commonwealth* v. *Harvard, supra.* We have never recognized entrapment as a ground for a motion to dismiss. Evidence of a defendant's conduct and the attendant circumstances is relevant to the specific issue of entrapment, and is relevant to the general issue of guilt as well. As a matter of procedural efficiency, that evidence should be presented only once. We conclude, therefore, that the issue of entrapment may be raised at trial only.[2]

Here, the defendant raised the issue of entrapment by his pretrial motion to dismiss the indictment. That motion was denied and the defendant did not raise the issue at any time during the trial. Since the issue was not properly raised below, we need not consider it on appeal. *Commonwealth* v. *Lewis,* 346 Mass. 373, 383 (1963), cert. denied, 376 U.S. 933 (1964).

Nevertheless, we have considered the defendant's entrapment argument, and we are satisfied that neither the evidence at trial nor the evidence before the motion judge was sufficient to show inducement. Therefore, the entrapment issue was not raised. The evidence does not reveal "lengthy negotiations . . . , aggressive persuasion . . . , coercive encouragement . . . [or] repeated or persistent solicitations" of the defendant. See *Commonwealth* v. *Thompson, supra* at 385. The passive behavior of the troopers in the defendant's office barely amounted to the "mere request" which we ruled in *Commonwealth* v. *Thompson, supra* at 386, was inadequate to support a finding of inducement. Furthermore, even if we were to conclude that there was sufficient evidence to show inducement, thereby raising the entrapment issue, the only consequence of that determination would be that the Commonwealth would have the burden of proving the defendant's predisposition to commit the crime. There was an abundance of evidence before the

---

[2] Of course, if a defendant's sole defense is that he or she has been entrapped, that defense may be tried before a judge without a jury as provided by Mass. R. Crim. P. 19 (a), 378 Mass. 888 (1979).

motion judge and before the trial judge that the defendant was predisposed to commit the crime. The result is that, even if the entrapment issue were raised, the question for the judge was one of fact. Contrary to the defendant's contention, therefore, he was not entrapped "as a matter of law."

The defendant's last contention is that the conduct of the State police was "so offensive to fair play that due process principles, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and [art. 12] of the Massachusetts Declaration of Rights, bar invoking judicial process to obtain a conviction." In substance, the defendant argues that, even if there was no entrapment, either because there was no inducement by the police or because the defendant was predisposed to commit the crime, nevertheless, the conduct of the police was so outrageous that dismissal of the indictment was constitutionally compelled. Since the defendant does not argue that his rights were greater under art. 12 of the Declaration of Rights than under the Fourteenth Amendment to the United States Constitution, we make no distinction between those documents in this case.

This court previously has not had occasion to consider whether, in the absence of entrapment, police conduct nevertheless may be so "offensive to fair play" that due process considerations "bar invoking judicial process to obtain a conviction." The defendant's argument focuses solely on the conduct of the police. The defendant's predisposition to commit the crime is irrelevant to the theory he advances. We think that this issue, like entrapment, should have been presented at trial rather than by a pretrial motion to dismiss. However, the issue is of first impression in this Commonwealth and we address it. The defendant's argument has been suggested by statements in two United States Supreme Court decisions. In *United States* v. *Russell*, 411 U.S. 423, 431-432 (1973), the Court observed that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due

process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." In *Hampton* v. *United States,* 425 U.S. 484 (1976), Justice Powell, joined by Justice Blackmun, stated in a concurring opinion that he was "unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor [the Court's] supervisory powers could support a bar to a conviction in any case where the Government is able to prove predisposition." *Id.* at 495. Three dissenting Justices expressed their agreement with Justice Powell's statement. *Id.* at 497.

The concurring opinion in *Hampton* v. *United States, supra* at 495 n.7, emphasizes that "the cases, if any, in which proof of predisposition is not dispositive will be rare. Police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." The Supreme Court has never held a conviction barred by due process principles because of police misconduct in the absence of entrapment. We are aware of only one case decided by a United States Court of Appeals since *Hampton* v. *United States, supra,* that has done so.

In *United States* v. *Twigg,* 588 F.2d 373 (3d Cir. 1978), the court held that the police involvement in the crime of which the defendant had been convicted was so overreaching as to bar the conviction. In that case, which involved the manufacture of drugs, the police suggested the criminal activity, provided essential ingredients and a location for an illegal laboratory, supervised the manufacturing process and furnished expertise that the defendant lacked. Police involvement in the present case was not nearly so extensive.

We disapprove of some of the police conduct, including the filing of falsified documents with the Registry of Motor Vehicles and the court. However, our disapproval does not redound to the defendant's benefit even if we accept the constitutional principle for which he argues, for the principle does not apply here. The evidence did not show police misconduct that was so egregious as to bar the defendant's conviction. "[T]he broad 'fundamental fairness' guarantee,

it appears from High Court decisions, is not transgressed absent 'coercion, violence or brutality to the person.'" *United States* v. *Kelly*, 707 F.2d 1460, 1476 (D.C. Cir.), cert. denied, 464 U.S. 908 (1983). There was no evidence here of coercion, violence or brutality, nor was there evidence of government conduct that "involved . . . pressure [or] persistent exploitation of personal weakness, as might occur if an agent preys upon an addict's need for narcotics." *United States* v. *Williams*, 705 F.2d 603, 620 (2d Cir.), cert. denied, 464 U.S. 1007 (1983).

Other considerations support the conclusion that no outrageous police conduct or fundamental unfairness occurred here. First, insurance fraud ordinarily is difficult to detect and prove without undercover police involvement. There is little reason to anticipate the cooperation of offending doctors, lawyers, and claimants. Second, the extent of the criminal activity by the police was minimal and it did not result in injury to third persons. Third, there was little police participation in the crime for which the defendant was convicted. The allegedly criminal conduct that the police engaged in, for the purpose of creating the appearance of an automobile accident, took place before the separate and distinct conduct of the defendant which led to his conviction.

*Judgment affirmed.*