COMMONWEALTH vs. JOHN H. QUIRK.

No. 88-P-641.

Middlesex.    February 17, 1989. — May 4, 1989.

Present: PERRETTA, KAPLAN, & KASS, JJ.

*Practice, Criminal*, Disclosure of evidence, Instructions to jury. *Entrapment*.

In the circumstances of the trial of a criminal case, there was no error in the judge's denial of the defendant's motion to strike the testimony of a witness summoned for the defense who changed her story to inculpate the defendant, or the judge's denial of a motion for a mistrial when the defense, through lack of diligence, could not produce a certain witness to testify. [261-263]

At the trial of indictments for distribution of cocaine, there was no reversible error in the judge's instruction with respect to drug addiction interfering with defendant's capacity to appreciate the wrongfulness of his acts, which had a basis in the evidence as presented by two psychiatrists. [263-264]

At a criminal trial no reversible error appeared in the judge's jury instructions, taken as a whole, on proof beyond a reasonable doubt. [264]

There was no merit to the contention of a criminal defendant, an experienced attorney who was convicted of distribution of cocaine, that the "immorality" of the police in accepting his client's offer to be an informer against the defendant warranted dismissal of the indictments. [264]

INDICTMENTS found and returned in the Superior Court Department on June 3, 1986.

The case was tried before *J. Harold Flannery*, J.

*John H. LaChance* for the defendant.

*Edward D. Rapacki*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Here is another prosecution in which a defendant, shown by solid evidence to have possessed and dealt in

illicit drugs, attempts to float the proposition that he was not predisposed to the crimes but was "entrapped" to commit them.[1]

In December, 1985, the defendant John H. Quirk, an experienced attorney, was representing Ronald Power on a charge of "operating under the influence." Power, worried about the likelihood of his being convicted, without Quirk's knowledge offered himself to the police as an informer, thereby hoping for their assistance in quashing the criminal charge. The police enlisted Power to inform on Quirk, who was suspected of using and selling cocaine. On April 18, 1986, and again on May 1, Quirk sold Power an "eight-ball" (one-eighth ounce) of cocaine, the prices, $300 and $275. Finally, on May 22, Quirk sold Power approximately one and one-eighth ounces of cocaine (31.67 grams, enough for a "trafficking" charge) for the price of $2,100. Quirk was arrested following that sale. Search of his person when he was booked, and subsequent search of his car and house, produced further amounts of cocaine and various drug paraphernalia. (All transactions had been under close police surveillance.)

The triers could rely on affirmative evidence of predisposition. Power's account of the sales indicated that Quirk delivered the merchandise without much demur. There was testimony of a police expert that the captured paraphernalia were probably those of a dealer (not merely a user).[2] Leading to the same conclusion was a consideration of the procedures and locations of the three "buys" as set by Quirk.[3] So also for the ease with

---

[1] Cf. *Commonwealth* v. *LaBonte*, 25 Mass. App. Ct. 190, 191-196 (1987); *Commonwealth* v. *Curcio*, 26 Mass. App. Ct. 738, 739-745 (1989).

[2] Found in Quirk's house: An Ohaus triple-beam balance scale with white residue. Full box of zip-lock sandwich bags. "Boston" magazine with squares cut out (squares presumably used for moisture-proof packaging of small doses). Bottle of Inositol powder (common cocaine dilutant). White ceramic plate with razor blade, yellow plastic spoon, cut-off straw, and small card.

[3] Quirk arranged with Power to meet at Tony Roma's the evening of April 18, 1986. When Power arrived, the bartender gave him a napkin with Quirk's telephone number inscribed. When Power called the number, Quirk directed him to go to Center Pizza at Framingham Center, where the sale was carried out. The May 1 sale was made at the far side of a parking lot

which Quirk was able to procure the thirty-one grams, which would have been enough to satisfy his own needs for thirty days. For further proof of predisposition the prosecution called one Roseann Solomont, who testified to sales by Quirk a few years earlier. We describe her involvement in some detail at point 1 below. So much for the Commonwealth's case-in-chief.

Quirk did not deny the sales and thus his commission of the acts encompassing the crimes, cited in the margin, of which he was convicted.[4] As to entrapment, he said he had not previously sold any drugs; himself an "addict," he said he could not resist supplying Power, who appeared to be also an addict and was importuning him for the cocaine; after the first transaction he felt threatened (although he said Power had not explicitly threatened him) and subject to exposure, and so he carried out the later sales in the hope of closing the book with Power. He said he bought on consignment the cocaine he sold Power, and he made no profit.[5]

The defense called a psychiatrist with knowledge of the psychological effects of cocaine use. Quirk, according to the witness, was cocaine-dependent. This would make him more compliant with requests for drugs than if he were in a normal state; and as a drug user he would empathize with the needs of fellow users.

The Commonwealth countered with the testimony of a psychiatrist in rebuttal. This witness defined Quirk as a leisure-time

---

at the Framingham Stop & Shop supermarket. On May 22, the two met at the same place but Power entered Quirk's car and was driven to Quirk's driveway, where the transaction occurred. They each inhaled a line of cocaine. Quirk drove Power back to the parking lot, where Power picked up his car. See also note 5 *infra*.

[4] Two counts of cocaine distribution, G. L. c. 94C, § 32A(*a*), for the April 18 and May 1 sales; one count of possession, G. L. c. 94C, § 34, in connection with the May 22 transaction. The jury acquitted Quirk of a charge of cocaine trafficking, G. L. c. 94C, § 32E(*b*) (1), and further charge under G. L. c. 94C, § 32A(*a*), in respect to the May 22 transaction. The indictment for possession of cocaine was placed on file with the consent of the defendant.

[5] Quirk said he had never possessed as much cocaine as was involved in the third sale, but managed to'persuade a source he did not know well to provide him with that amount on a consignment basis.

or end-of-workday user of above average, trained intelligence. He said Quirk's ordinary mental and psychological functions would not be impaired by that kind of indulgence in cocaine.

The verdicts and convictions were warranted by the evidence. We respond to Quirk's points on appeal.

1. About a year before trial (which commenced on October 26, 1987), Roseann Solomont told defense counsel Mr. John H. LaChance that she had known Quirk well and he had never sold drugs to anyone. Accordingly, Mr. LaChance listed Solomont as a defense witness and on Wednesday or Thursday, October 21 or 22, served her with a subpoena. Solomont, evidently alarmed, immediately called Mr. LaChance, then spoke with Officer Lawrence Chism of the Framingham police (who had testified earlier in the trial as one of the officers conducting surveillance). Chism directed her to the prosecutor, Mr. James Brick. On Sunday, October 25, Solomont told Mr. Brick she would testify that Quirk had sold her drugs. Mr. Brick provided her with an "immunity" letter.[6] Messrs. Brick and LaChance were in touch on Thursday and Sunday and Mr. LaChance was advised of Solomont's change of heart. Mr. Brick reduced to writing what Solomont was now saying and gave the memorandum to Mr. LaChance on the first day of trial.[7]

Solomont took the stand on Thursday, October 29. She testified that four or five years previously she had been a client of Quirk's and after a year they began dating. They often took cocaine together. Perhaps a half dozen times she saw Quirk weighing cocaine on an Ohaus beam and packaging it in quarter-, half-, and one-gram sizes. She was a dealer at the time and Quirk, on a few occasions, sold her eight-balls for resale.

---

[6] Mr. Brick's letter promised that, in exchange for her truthful testimony, she would not be prosecuted by the district attorney for the Northern District for any participation by her with Quirk in drug violations. (This was brought before the jury in Solomont's cross-examination.)

As to the status of a so-called immunity letter, see Smith, Criminal Practice and Procedure § 811 & n.4 (2d ed. 1983).

[7] Much of the content of the foregoing paragraph was made known to the judge through representations of counsel, outside the jury's hearing.

Under cross-examination, Solomont admitted she had told Mr. LaChance perhaps a year ago that Quirk had never sold drugs. In saying that, she now testified, she had lied. Solomont now also testified she had been friendly with Officer Chism of the Framingham police for the past year and at some point, probably a year ago, she might have told Chism about buying cocaine from Quirk for resale.

The last reference to Chism might have been of interest to defense counsel: they might want to recall Chism to test what Solomont told him (although the tactic might prove dangerous), and they might argue that the Solomont-Chism conversation should have been disclosed to them in obedience to a discovery order.[8] However, from Thursday through Sunday the defense took no steps to subpoena Chism (it appears that on Friday or Saturday, October 30 or 31, Mr. LaChance had seen Chism but did not attempt to communicate with him). On Monday, November 2, as trial resumed, the defense sought to have Chism recalled, but he had left for Georgia on vacation. The defense moved to strike Solomont's testimony or for a mistrial in case Chism could not be produced. Mr. Brick's efforts to locate Chism failed. The motion was denied, and the denial is the subject of appeal.[9]

The defense claimed surprise in Solomont's about-face, but they had initially proposed her as their witness, and they might well have perceived that her main interest was in saving herself from prosecution (see note 6). No basis was shown for any claim that the prosecutor knew of an avowal by Solomont to Chism and failed to give discovery of it. Doubtfully, Chism's (supposed) knowledge might be imputed to the prosecutor.[10]

---

[8] The reference is to an order of June 12, 1987, requiring disclosure of matters antedating the earliest offense charged that indicated predisposition — specifically that Quirk had distributed or offered to distribute cocaine.

[9] Associated with this complaint by the defense is the judge's denial of defense motions to depose Solomont or examine her on voir dire before she commenced testifying.

[10] Compare *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.8 (1980); *Commonwealth* v. *Redding*, 382 Mass. 154, 157 (1980); *Commonwealth* v. *Fontaine*, 402 Mass. 491, 492-493, 496 n.9 (1988); *Commonwealth* v. *Soucy*, 17 Mass. App. Ct. 471, 474 (1984).

In any case, the prosecutor was in touch with the defense as soon as he learned how Solomont intended to testify. The defense is chargeable with lack of vigilance in failing from Thursday through Sunday to tie Chism down to testify on recall. Apart from all this, (i) Solomont's story was blasted on cross-examination when she admitted lying, so it is unlikely that the defense could have been materially injured by any delay in the disclosure of what her testimony might be; [11] and (ii) there was evidence of Quirk's predisposition without regard to Solomont's contribution.

Thus, while our narrative about Solomont is necessarily lengthy, the answer is short: there was no error calling even remotely for reversal.

2. By pretrial motion, the Commonwealth sought a ruling that a defendant's claimed drug addiction should not figure — should be excluded from consideration — on the issue of entrapment. The judge denied the motion and in his instructions dealt with addiction, in its possible bearing on entrapment, in two blending aspects: as weakening the addict's will to resist pressures and as interfering with the addict's capacity to appreciate the wrongfulness of his acts. The defense has no quarrel with — and, indeed, was insistent upon — the first element, but objected to the second as muddying the meaning of, or reducing emphasis on, the first. We do not consider whether, as matter of law, addiction has any place in instructions on entrapment. [12] The judge plainly intended to be as generous as possible toward the defendant. The charge so far as it spoke

---

[11] See *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895 (1979); *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980); *Commonwealth* v. *Vieira*, 401 Mass. 828, 833-836 (1988).

[12] Compare *United States* v. *Henry*, 417 F.2d 267, 270 (2d Cir. 1969), cert. denied, 397 U.S. 953 (1970); *United States* v. *Steinberg*, 525 F.2d 1126, 1132 (2d Cir. 1975), cert. denied, 425 U.S. 971 (1976); and MacKinnon, J., dissenting in *United States* v. *Borum*, 584 F.2d 424, 435-436 (D.C. Cir. 1978), with the *Borum* case at 428 n.3, and *United States* v. *Hill*, 655 F.2d 512, 516 (3d Cir. 1981). See also Park, The Entrapment Controversy, 60 Minn.L.Rev. 163, 176-179 (1976); Carlson, The Act Requirement and the Foundations of the Entrapment Defense, 73 Va.L.Rev. 1011, 1037-1044 (1987).

to ability to appreciate wrongfulness did not serve to weaken the rest, and it had a basis in the evidence because both psychiatrists went into this question.

3. At one point in the instructions, the judge misspoke and said of the proof needed to convict, "It is not proof beyond all reasonable doubt." [13] But this was submerged and supplanted at a number of places by correct formulations of the burden of proof. The jury could not have been misled. [14]

4. By motion before trial, and again at trial, the defense contended that there was such immorality in the Commonwealth's setting a client to catch his counsel that the prosecution should be dismissed. We do not sit to adjudge whether a refined taste would approve the police method. To such a taste all use of informers is repugnant. The Commonwealth was not insinuating itself to impair Quirk's representation of Power in the criminal prosecution for drunken driving. [15] Perhaps the defense is claiming that an attorney would be a particularly vulnerable mark for an importuning client. That would not be the case, we think, where the client is suggesting that the attorney join with him in a criminal enterprise.

*Judgments affirmed.*

---

[13] See *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. 215, 220 n.4 (1985), and *Commonwealth* v. *Santos,* 402 Mass. 775, 788 (1988), disapproving the charge in *Commonwealth* v. *Little,* 384 Mass. 262, 266 n.4 (1981).

[14] See *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. at 217-220; *Commonwealth* v. *Bowie,* 25 Mass. App. Ct. 70, 80-81 (1987).

[15] Thus the case of *Commonwealth* v. *Manning,* 373 Mass. 438, 442-445 (1977), is not in point.