COMMONWEALTH vs. STANLEY JAMES MCMILLER.

No. 89-P-513.

Middlesex. November 16, 1989. - October 17, 1990.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Entrapment. Controlled Substances. Practice, Criminal*, Disclosure of
identity of informer, Access to witness, Conduct of prosecutor. *Constitutional Law*, Self-incrimination. *Evidence*, Informer. *Witness*, Immunity, Self-incrimination.

In a criminal case, the prosecutor improperly refused to disclose the iden-
tity of a police agent to the defendant, where the court had ordered
such disclosure. [405-406] BROWN, J., concurring.
In a criminal case in which the defendant was charged with sales of co-
caine to an undercover police detective and in which the defendant suf-
ficiently raised the defense of entrapment by a police agent, the defend-
ant was denied a fair trial by reason of prosecutorial interference with
access to the police agent in circumstances where the prosecutor
threatened the agent with prosecution for her other activities, with the
result that she asserted her privilege against self-incrimination when
called as a witness for the defendant. [406-409] BROWN, J., concurring.

INDICTMENTS found and returned in the Superior Court
Department on June 19, 1986.

The cases were tried before *Barbara J. Rouse*, J.

*Mary F. Costello* for the defendant.

*Sanford Kreisberg*, Assistant District Attorney, for the
Commonwealth.

PERRETTA, J. There is no dispute that on four occasions
the defendant sold cocaine to Lawrence Chism, an under-
cover detective with the Framingham police. Chism arrested
the defendant immediately after paying him at the fourth
sale which, unlike the first three, now involved a sufficient
amount (31.77 grams) of cocaine to constitute the crime of
drug trafficking under G. L. c. 94C, § 32E(*b*)(1), as in ef-
fect prior to St. 1988, c. 124. At trial, the defendant admit-

ted to the sales and testified that he was solicited and repeat-edly asked by Chism and an informant, Roseann Solomont, to sell cocaine to Chism in varying amounts. There was little in Chism's testimony that was helpful to the defendant's claim of entrapment, and Solomont asserted her testimonial privilege against self-incrimination. All the issues raised by the defendant on his appeal involve the question whether Solomont's testimony was rightfully withheld from him. We conclude that fundamental fairness requires that the defend-ant's convictions be reversed.

1. *The Defense of Entrapment.*

At the heart of the defendant's appeal is his allegation that the Commonwealth, by its actions in respect to Solomont, prevented him from presenting his defense and thereby de-prived him of a fair trial. To put the evidence in its proper perspective for consideration of this claim, we begin by set-ting out the law of entrapment. " 'The defense of entrapment is appropriately raised . . . by the introduction of some evi-dence of inducement by a government agent or one acting at his direction. Mere evidence of solicitation is not enough to show inducement, but little more than solicitation is required to raise the issue. '[A]ny evidence . . . that the government agents went beyond a simple request and pleaded or argued with the defendant, should be enough.' *Kadis* v. *United States*, 373 F.2d 370, 374 (1st Cir. 1967). When evidence of inducement has been entered, the burden rests upon the Commonwealth to prove beyond a reasonable doubt the pre-disposition of the defendant to commit the crime . . . The jury . . . may . . . properly consider the conduct of the de-fendant as related to the indictments at issue . . . and pre-disposition may warrantably be found upon this kind of evi-dence alone, if the evidence is of sufficient significance." *Commonwealth* v. *Shuman*, 391 Mass. 345, 351 (1984), quoting from *Commonwealth* v. *Miller*, 361 Mass. 644, 651-652 (1972), and citing *Commonwealth* v. *Thompson*, 382 Mass. 379, 383-386 (1981). See also Perkins, Criminal Law 1163 (3d ed. 1982); 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 13.09 (3d ed. 1977).

II. *The Evidence at Trial.*

a. *Chism's testimony.* In April and May of 1986, Chism was working in an undercover capacity for the Framingham police narcotics unit. Specifically, he was "working the Route 9 . . . restaurant, lounge-type bars" in Framingham. On April 7, his undercover work brought him, for the first time, to Tony Roma's. It was about 8:10 P.M., and he was accompanied by Solomont, whom he described as an "informant" for the Framingham police.

Chism explained that he had met Solomont in March of 1986, at the time of her arrest by the "uniform division" of the Framingham police. One of the charges made against her was possession of cocaine. As it was "departmental policy that all persons charged with narcotic violations are to be interviewed by the Narcotics Division," Chism interviewed Solomont. During the interview, Solomont agreed to introduce Chism to individuals with whom she was familiar in the Framingham area who were selling narcotics. In return, Chism would speak to the district attorney "in regards to her case, which was pending, and make the D.A. aware of her cooperation" with the police. He further testified that Solomont was prosecuted for the charges for which she had been arrested.

Upon their arrival at Tony Roma's, Chism and Solomont sat at the bar and talked with different people Solomont knew and introduced to Chism. When the defendant came into the bar, he joined the group, met Chism, and they all engaged in general conversation for a few minutes. Chism then asked the defendant if he had any cocaine that he could buy. The defendant said he only had an eight-ball (one-eighth ounce). Chism inquired as to price, the defendant stated $300, and Chism indicated that he would buy it. The defendant told Chism that he had to see "some people briefly at the end of the bar" and would get back to him.

Chism saw the defendant walk to the end of the bar and speak with people. He returned to Chism and Solomont, and the three went out to the parking lot and got into the defendant's 1968 Mustang convertible, Solomont in the back and

the men in front. The defendant, seated behind the wheel, reached beneath the dashboard near his door, pulled out a "magazine paper packet," and handed it to Chism who, in turn, gave the defendant $300. As Chism opened the packet, he asked the defendant whether, "if it was good stuff," they "could do business again." The defendant told Chism "no problem, or something to that effect."

It was Chism's estimate that fifteen to twenty minutes passed between the time he met the defendant and completed the purchase from him. After the sale, Chism brought Solomont to her car and returned to police headquarters.

Five days later (April 12), at about 9:45 P.M., Chism and Solomont were again at Tony Roma's, sitting at the bar. The defendant came through the front door and stopped to speak briefly with various people as he wended his way towards the bar. Once at the bar, he exchanged pleasantries with Chism and Solomont, and Chism then asked if he had any cocaine that he could buy. The defendant told Chism that he had only "45's," a term Chism described as meaning "a 45 gram of cocaine." The defendant went to another area of the bar, spoke briefly with some people, returned to Chism, and told him that they were to go out to the parking lot. The defendant left the bar first.

As Chism got to the door, he saw the defendant walking ahead with two men. Chism followed and saw them get into a car. Chism refused to get into the car, telling the defendant that he did not know the men and that he would conduct his business from where he was standing. The defendant handed Chism a packet which he examined. Chism then gave the defendant a fifty dollar bill, and the defendant handed it to one of the men in the car. That person returned five dollars to the defendant for Chism.

Chism next saw the defendant, apparently by chance and not arrangement, on April 17, 1986, about 10:30 P.M., at Tony Roma's. Within minutes of bumping into each other, Chism purchased another "45" from the defendant.

An investigation of a different suspect brought Chism to Tony Roma's on April 19, 1986. Seeing the defendant, he

now asked to buy an "ounce and eight-ball" from him. He explained to the defendant that he had been doing business with him "for a while," and he now wanted "to make some money" for himself. The defendant advised Chism that he would have to get back to him and asked for a telephone number. Not wanting to reveal his number (the police station), Chism told the defendant that he "stayed on the move quite a bit" and that he could be reached through Solomont. There was a discussion as to price, with Chism protesting that $2,200 was too high and the defendant promising that he would see what he could do.

Solomont called Chism the morning of May 22 and told him that the sale was to take place that date. Because the time set by the defendant and related by Solomont to Chism "created a problem" with his "other investigations," he suggested a different hour. It took a "number" of calls between Solomont and Chism to schedule the sale, but ultimately it was set that Chism would meet the defendant at 10:00 P.M., in the parking lot of a Framingham convenience store.

Arriving at the appointed place, which was now under surveillance, Chism got into the defendant's car. The defendant wanted to leave the lot, but Chism refused. The defendant produced the cocaine and told Chism that the ounce was priced at $2,200 and the "eight-ball" at $250. When Chism complained, the defendant assured him that the price was the best he could do and that he would try to do better the next time. Chism took the cocaine, paid the defendant, and placed him under arrest. The surveillance team moved in, removed the defendant from his car, and took him to the police station.

At the police station, the defendant signed a form consenting to the search of his apartment. The police found the following items in the defendant's bedroom: two gram-weight scales (one large, one small), white paper packets, a sifter, a small funnel, a teacup containing white powder, a ceramic ashtray tipped over with white powder beneath it, a mirror across the ashtray, Inositol, and a box of baking soda. A State police officer, testifying as an expert, stated that in his

opinion the items seized during the search would facilitate the distribution of cocaine.

b. *The defendant's testimony.* In early 1986, the defendant was not working. He had sustained a back injury from a fall at his place of employment. He was receiving $345 a week in workers' compensation benefits and was sharing an apartment with one other person. He was also advertising to sell his 1968 Mustang convertible, which he had restored and viewed as a "classic," for $4,495.

During this time period, the defendant frequented Tony Roma's almost nightly. It was very near to his apartment, and he knew many of the habitués, one of whom was Solomont. He first met her there, as "Roseann," in early February, 1986. She was known to be a "source" of cocaine, and the defendant had actually seen her selling the drug. Although their initial conversations concerned her interest in buying the defendant's car, they became more acquainted. The defendant then purchased cocaine from her a few times for his personal use. On one or two occasions, he even took the drug with her.

Although he was not certain of the exact date, it was the defendant's best memory that Solomont introduced him to Chism sometime around his birthday, March 12. They were at Tony Roma's bar and Solomont presented Chism to the defendant as a "very good friend of hers" and a "very nice guy." They sat and talked and then: "[Chism] was interested in the market of getting some [cocaine], and I told him I wasn't in the business, she was asking me mostly — he would ask her a question and she would turn her head and then ask me . . . [T]hey would be side by side. And he wouldn't directly ask me each time. She did most of the talking."

After this first meeting, the defendant would see Chism and Solomont at Tony Roma's about once or twice a week. At this time, Chism indicated an interest in buying the defendant's car for Solomont and told him that he was going to see whether he could get a bank loan. Here we point out that when asked on cross-examination whether he and the defendant ever spoke about buying his car, Chism testified that

Solomont might have shown some interest, but he never had any conversations with the defendant concerning the purchase of the car.

Perhaps because of the frequency with which all involved were at Tony Roma's, there is confusion or lack of specificity as to dates of conversations. In any event, sometime in early April, the defendant received a telephone call from Solomont, asking him to meet her and Chism that night at Tony Roma's. The defendant agreed. As they sat at the bar and talked, Chism asked the defendant if he could get him half a gram of cocaine. The defendant told Chism that he was "not into that," "I don't do that." Chism pointed out that because of their common background (Afro-American), they should "take care" of each other. As explained by Chism to the defendant, if the defendant would get him an "eight-ball," he would press his bank for a loan and buy the defendant's car. Back and forth it went, and finally an agreement was reached. The defendant would get Chism an "eight-ball" and Chism would buy the defendant's car for $4,300. Chism told the defendant that as soon as the loan was approved, he would let Solomont know so that she could tell the defendant. Solomont called the defendant, and they arranged to meet the next night at Tony Roma's. On April 7, the defendant sold Chism the "eight-ball." He also admitted that he sold cocaine to Chism on the dates and in the amounts described by Chism.

According to the defendant, however, from April 7 up to May 22, over the telephone and at Tony Roma's, Roseann or Chism, sometimes both, spoke with him "almost every day" and "every day they tried to talk to . . . [him] about getting . . . [cocaine] because they claimed that their supplier was no longer in business and he [Chism] needed somebody." They repeatedly asked the defendant for different quantities of cocaine, but he would insist to them, "I'm not a dealer, and I'm not getting involved with that," and Chism would bring up the car sale, assuring him that his bank loan would soon be approved.

During this period of urging by Roseann and Chism, and after the sale of April 17, the defendant began to buy and "stockpile" small amounts of cocaine until May 22 when he had accumulated one ounce and one-eighth ounce. The defendant's testimony concerning that sale and his arrest need not be repeated.

As for the evidence taken from his bedroom by the police, the defendant explained that the items, other than the large scale, were common kitchen utensils which he had used, along with the Inositol and baking soda, to "stretch" the amounts of cocaine which he had been buying and hoarding for Chism. He had found the large scale in the basement of his previous apartment building where he had been the resident manager. When he moved to his present apartment, he brought the scale with him. The white paper packets were adding machine rolls which he kept next to his telephone for messages.

While being questioned at the police station after his arrest, the defendant was asked if he would be willing to cooperate with the police. Cooperation consisted of working with Chism and other police officers, bringing them to local bars and restaurants, and introducing them to various people in much the same fashion as Solomont had introduced Chism to him.

At the close of the evidence and pursuant to the Commonwealth's request, the trial judge ruled that, because Solomont had invoked her right to refuse to testify and was, therefore, unavailable as a witness, defense counsel could make no reference in his closing argument to the Commonwealth's failure to call her, see *Commonwealth* v. *LaBonte*, 25 Mass. App. Ct. 190, 197 (1987), and that no jury instruction would be given concerning what inferences were available from the absence of the witness. See *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-294 (1974); *Commonwealth* v. *Happnie*, 3 Mass. App. Ct. 193, 195-197 (1975). The trial judge did instruct the jury on the defense of entrapment.

Although we do not accept the defendant's argument that he was entrapped as matter of law, his testimony was suffi-

cient to put to the jury the claim made by him, that is, that Chism, acting with and through Solomont, "brought about . . . [his] predisposition to crime." *Commonwealth* v. *Shuman*, 391 Mass. at 351. Compare *Commonwealth* v. *Curcio*, 26 Mass. App. Ct. 738, 739-745 (1989).

III. *Solomont's Availability.*

Commencing with pretrial motions as early as November 24, 1986, the defendant sought the name of the cooperating individual known to him only as "Roseann," as well as information concerning whether any promises, rewards, or inducements had been made to her. Notwithstanding several hearings during which the prosecutor was advised to disclose as to the April 7 transaction or to dismiss that indictment, the prosecutor did neither. See *Commonwealth* v. *Ennis*, 1 Mass. App. Ct. 499 (1973). Cf. *Commonwealth* v. *Lugo*, 23 Mass. App. Ct. 494 (1987), after remand, 406 Mass. 565, 571-574 (1990).

We learn from an affidavit filed by defense counsel "under pains and penalties of perjury" that the prosecutor did allow Roseann to be interviewed. At 5:30 P.M., March 12, 1987, defense counsel met the prosecutor at her office in the courthouse. There the prosecutor placed a telephone call "to a woman purported . . . to be the individual" in issue and remained on the line while defense counsel spoke with Roseann from "another telephone near to" the prosecutor.

Without revealing her identity, Roseann told defense counsel that she was present at one sale, that she "actually witnessed discussions between Chism and the defendant on four occasions regarding Chism buying cocaine from the defendant," that "[a]ll of these discussions occurred at Tony Roma's," that these discussions "led immediately thereafter to the purchase of cocaine by Chism from the defendant," that she was "present and overheard discussions between the defendant and Chism for the purchase and sale of one and one-eighth ounces of cocaine," that pursuant to Chism's request, she personally spoke with the defendant to arrange his meeting with Chism on May 22, that she was " 'under investigation' in connection with narcotics," that she " 'would

rather not say' if there were any discussions" with the Framingham police "regarding leniency in her pending criminal cases" which she described as " 'bad checks' and possession of one-half gram of cocaine," that she had "no trial on the 'bad check' case as she made restitution," and that her "possession" case "was continued without a finding."

This affidavit was presented to the court on March 27, 1987, when defense counsel again sought allowance of his motion. The prosecutor did not challenge the accuracy of the affidavit but resisted the motion on the grounds that the defendant was aware of "this individual's identity to some extent," that her name had been "technically . . . theoretically" disclosed by the Commonwealth, and that the motion was being used as a "vehicle so that we can do his investigating." Defense counsel left no room for doubt as to the basis for his motion: "I want to put her on the stand to testify that they put her out on the street to solicit cocaine sales and that that's how Stanley McMiller got dragged into this thing."

The motion judge ordered "disclosure" of the identity of the witness as to the April 7 transaction or dismissal of that indictment. As to the remaining indictments, the judge denied the motion but instructed the prosecutor "to have that witness available for trial if the defendant feels that he wants to call her as a witness."

As of October 26, 1987, the prosecutor had not made disclosure. That is the date on which trial commenced in *Commonwealth* v. *Quirk*, 27 Mass. App. Ct. 258, 261-262 (1989). From that case, we know that Chism participated in Quirk's arrest on May 22, 1986, about an hour before meeting and arresting the defendant in the present case.[1] Quirk,

---

[1]Because of the concerns we expressed at oral argument regarding the testimony about the activities of Chism and Solomont in this case and their respective roles in *Quirk, supra,* the Commonwealth, by letter submitted after oral argument, advised us that it had no objection to our "independent review of the *Quirk* materials as part of . . . [our] consideration" of the issues raised on the instant appeal. We have reviewed and considered pertinent portions of the testimony given in *Quirk* in deciding this appeal for three reasons: (1) the record in *Quirk* constitutes papers of this court, cf. *Brookline* v. *Goldstein,* 388 Mass. 443, 447 (1983), (2) por-

an attorney, was charged with dealing in cocaine, having sold about one and one-eighth ounces of that drug to a client in a criminal matter who, without Quirk's knowledge, had "offered himself to the police as an informer, thereby hoping for their assistance in quashing the criminal charge." *Id.* at 259. Quirk claimed entrapment, and the Commonwealth called Solomont to testify to his predisposition.

Solomont testified in that trial under circumstances we here repeat.[2] "About a year before trial (which commenced on October 26, 1987), Roseann Solomont told defense counsel Mr. John H. LaChance that she had known Quirk well and he had never sold drugs to anyone. Accordingly, Mr. LaChance listed Solomont as a defense witness and on Wednesday or Thursday, October 21 or 22, served her with a subpoena. Solomont, evidently alarmed, immediately called Mr. LaChance, then spoke with . . . Chism . . . (who had testified earlier in the trial as one of the officers conducting surveillance). Chism directed her to the prosecutor, Mr. James Brick. On Sunday, October 25, Solomont told Mr. Brick she would testify that Quirk had sold her drugs. Mr. Brick provided her with an 'immunity' letter. Messrs. Brick and LaChance were in touch on Thursday and Sunday and Mr. LaChance was advised of Solomont's change of heart. Mr. Brick reduced to writing what Solomont was now saying and gave the memorandum to Mr. LaChance on the first day of trial. Solomont took the stand on Thursday, October 29. She testified that four or five years previously she had been a client of Quirk's and after a year they began dating. They often took cocaine together. Perhaps a half dozen times she saw Quirk weighing cocaine on an Ohaus beam and packaging it in quarter-, half-, and one-gram sizes. She was a dealer at the time and Quirk, on a few occasions, sold her eight-balls for resale. Under cross-examination, Solomont admitted

tions of the *Quirk* proceedings were made part of the trial record in the present case; and (3) the parties do not object.

[2]It should be kept in mind that at the time of Solomont's testimony at Quirk's trial, the prosecutor in the present case had yet to disclose her identity to the defendant. Although the two cases were handled by different attorneys, the prosecutors were from the same office.

she had told Mr. LaChance perhaps a year ago that Quirk had never sold drugs. In saying that, she now testified, she had lied. Solomont now also testified she had been friendly with . . . Chism . . . for the past year and at some point, probably a year ago, she might have told Chism about buying cocaine from Quirk for resale . . . [footnotes omitted]." *Id.* at 261-262. When trial resumed on November 2, Mr. LaChance, who had last seen Chism on October 30 or 31, attempted "to have Chism recalled, but he had left for Georgia on vacation." *Ibid.*

When Solomont appeared at Quirk's trial pursuant to the Commonwealth's subpoena, with an "immunity letter" but without counsel, the judge conducted an extensive voir dire. The letter protected Solomont only from prosecution by the "Middlesex District Attorney's Office" for her "participation with John Quirk in violations of the controlled-substance act, including possession, distribution and trafficking of cocaine, and the conspiracy to do the same." The judge asked the prosecutor as to Solomont's risk of prosecution independent of the letter. Mr. Brick answered, "Miminal. Extremely minimal." When the judge pressed, Mr. Brick expanded: "The United States Attorney's Office and the Attorney General's Office as far as I know of would be the only two possible law enforcement agencies that could prosecute her for crimes, since I believe that things she would testify to all occurred within Middlesex County."

Solomont was then fully advised by the judge of the extent of the protection afforded her by the "immunity letter" and the possible scope of cross-examination. The judge also asked Solomont whether she would like counsel, private or appointed, to be present during her testimony. Solomont stated that she understood the risks and her rights and that she would "go forward without an attorney."

As of July 15, 1987, trial in the instant case was scheduled for November 13, 1987. On that latter date, fifteen days after her testimony in the Quirk trial, Solomont appeared in court in the present matter pursuant to a summons from defense counsel. He had discovered her identity on No-

vember 6, 1987, not from the prosecutor, but from a newspaper account of Quirk's trial.

Upon examination by her court-appointed lawyer, defense counsel, and the trial judge, Solomont responded that she did not wish to testify, and she declined to respond to any questions on the ground that the answers might incriminate her. In arguing that Solomont's fears were very real, the prosecutor made representations that were quite different from Mr. Brick's assurances given fifteen days earlier at the Quirk trial. We set them out.

> "[O]nce . . . [the witness] takes the stand, and even if [defense] counsel is representing that he is only going to ask her about her involvement in this particular case, I suggest that that would involve her testifying, or her being subject to cross-examination concerning her involvement in other cases concerning her purchasing drugs, or selling drugs, in other cases. It would also include testimony, and upon representation I have a good faith basis for believing that she would also testify in her purchases of cocaine from the defendant prior to the time that Detective Chism bought the cocaine, and I would suggest that would be admissible to show predisposition. That would subject her to a Fifth Amendment privilege as to prior dealings.
>
> "Her dealings in this case, your Honor, would also subject her to the possibility of prosecution. There's been no grant of immunity, or any promise not to prosecute in this case, and her actions with Detective Chism, simply because they're agents, don't necessarily protect her from prosecution from this office, or from any other law enforcement office within the State.
>
> "And I would suggest, your Honor, that counsel would be going into areas involving her involvement in drug use and narcotics, and purchases, and use. And even if he didn't do it on direct examination, it would certainly be open to the Commonwealth to discuss those issues on cross-examination and discuss those issues concerning the defendant's — her involvement with the

defendant prior to this time. And once she starts to testify, will not be able to invoke Fifth Amendment right at that time.

. . .

"[H]er Fifth Amendment right is in existence . . . [S]he cannot testify simply to the things that counsel is stating that she can testify to, and then invoke her Fifth Amendment right on those areas that she will be exposing herself to."

It was defense counsel's position that it was "fundamentally unfair for the Commonwealth to use a person . . . as an agent for the purpose of investigating crime, and then try to insulate an essential witness to the defense . . . . They can't have it both ways." In support of his argument, defense counsel made reference, in broad and general terms, to Solomont's immunity letter and testimony in the Quirk trial.

Finding that Solomont's claim of the privilege was valid, the trial judge excused her. It appears that at the conclusion of the hearing, defense counsel asked that copies of the immunity letter and Solomont's earlier trial testimony, both of which had been given to him by Quirk's attorney, be marked as exhibits. Trial commenced the following Monday, November 16, and proceeded as described.

IV. *Discussion.*

It was wrong to refuse to disclose Solomont's identity to the defendant. "Nor can we accept the distinction urged by the Commonwealth between an informer who participates in the crime and one who is merely a witness. In either event his involvement is such that the disclosure of his identity is important to a fair determination of the case." *Commonwealth* v. *Ennis*, 1 Mass. App. Ct. at 503, and cases therein cited. From the outset, the prosecutor knew, because of the rulings on the defendant's motions, she could not both rely upon the so-called "informer's privilege" and proceed to trial on the April 7 transaction, at the least. See *Rovario* v. *United States*, 353 U.S. 53 (1957); *Commonwealth* v. *Ennis*, *supra.* Cf. *Commonwealth* v. *Lugo*, 23 Mass. App. Ct. at 497-501, appeal after remand, 406 Mass. at 571-574. See

also Smith, Criminal Practice and Procedure § 207 (2d ed. 1983 and 1990 Supp.).

As of November 6, the date of the newspaper article from which defense counsel learned Solomont's identity, and with a long outstanding trial date of November 13 approaching, the prosecutor had yet to make her election. With the newspaper article, however, the matter resolved itself. "With the informer's identity known, the Commonwealth could not claim the 'informer's privilege' of barring testimony by . . . [her]. See *Commonwealth* v. *Congdon*, 265 Mass. 166, 175 (1928); *Pihl* v. *Morris*, 319 Mass. 577, 579 (1946); Liacos, Handbook of Massachusetts Evidence 191-192 (5th ed. 1981)." *Commonwealth* v. *Curcio*, 26 Mass. App. Ct. at 747.

There remains, nonetheless, Solomont's testimonial privilege. "We recognize that the assertion by a witness of his Fifth Amendment right may in some cases hinder a defendant's ability to present his most effective defense." *Commonwealth* v. *Curtis*, 388 Mass. 637, 646 (1983). Her rights cannot be ignored for the defendant's benefit. "[A] witness who asserts his privilege cannot be compelled to testify unless it is '*perfectly clear* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate" (emphasis original). *Powers* v. *Commonwealth*, 387 Mass. 563, 564-565 (1982), quoting from *Malloy* v. *Hogan*, 378 U.S. 1, 12 (1964), and *Hoffman* v. *United States*, 341 U.S. 479, 488 (1951).

The Commonwealth argues that Solomont's assertion of her privilege was valid. The argument begs the issue. In the face of the prosecutor's remarks to the trial judge in support of Solomont's refusal to testify, we do not doubt the sincerity of Solomont's fear of prosecution. That is where the problem lies.

*United States* v. *Diaz*, 535 F.2d 130, 134 (1st Cir. 1976), quoted from in *Commonwealth* v. *Curcio*, 26 Mass. App. Ct. at 747, is instructive: "As we observed in *United States* v. *Williams*, 496 F.2d 378 (1st Cir. 1974), the government's duty with respect to *production* of an informant, as distin-

guished from its duty to merely name the informant, is not easily stated. However, we noted in *Williams* that this duty is dependent on several factors, among them the extent of the government's control of the witness, the importance of the witness' testimony, and the difficulty in finding the witness. Moreover, we indicated that the government would not be held at fault for failure to produce an informant where it could affirmatively show to the court's satisfaction that the production of the informant could not be expected and that its conduct has been diligent . . . [citations omitted]" (emphasis original).

Here the Commonwealth had a duty to disclose Solomont's identity and make her available as a witness. According to Solomont's testimony at the defendant Quirk's trial, her statements to defense counsel as set out in his affidavit and unrefuted by the prosecutor, and the testimony of the defendant, she was an active participant with Chism. Moreover, she acted with the approval and at the direction of the police. By Chism's description of Solomont's role, that she was only to introduce him to known drug dealers and he would proceed from there, the defendant's predisposition was established in the eyes of the jury. Cf. *United States* v. *Webster*, 649 F.2d 346, 347 (5th Cir. 1981), holding that "hearsay evidence is only admissible in an entrapment case under the usual rules relating to hearsay, so that hearsay may not be introduced as evidence of predisposition." The Commonwealth's arguments, that Solomont's role in this "garden variety drug case" was "un-unique" and that her testimony, at best, would only have been cumulative of the defendant's, range from simplistic to cavalier.

We think it should be obvious that where the Commonwealth has a duty to disclose the identity of a witness and to produce the witness, or where a defendant himself locates a witness, the Commonwealth also has a duty to refrain from interfering with or hindering access to that witness' testimony. See *Commonwealth* v. *Balliro*, 349 Mass. 505, 516-518 (1965); *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 657-658 (1979); S.J.C. Rule 3:22A, PF3(b), 377 Mass. 924

(1974). The question before us is not, at this stage, whether Solomont should have been granted some form of "judicial" immunity. See, e.g., *Commonwealth* v. *Curtis*, 388 Mass. 637 (1983); *Commonwealth* v. *Doherty*, 394 Mass. 341, 343-346 (1985). Rather, the question is whether on this record the defendant has made a sufficient showing that he was denied a fair trial by reason of prosecutorial interference with access to a witness.

Notwithstanding the prosecutor's claim to the contrary, Solomont "could not justifiably fear prosecution for . . . [her] involvement in the sale transaction[s] between the defendant and [Chism], because [she] was here acting with the assent and encouragement of the police. See *Commonwealth* v. *Baker*, 155 Mass. 287, 291 (1892)." *Commonwealth* v. *LaBonte*, 25 Mass. App. Ct. at 196. As for any transactions other than at Chism's behest, Solomont testified extensively on cross-examination by defense counsel at the defendant Quirk's trial. We do not suggest that she thereby waived her testimonial privilege. See *Commonwealth* v. *Borans*, 388 Mass. 453, 457 (1983). It is noteworthy, however, that the prosecutor at the defendant Quirk's trial was willing to overlook her transgressions in exchange for her truthful testimony. Less than a month later, the prosecutor not only took an unforgiving stance, she indicated that it would be she who would elicit any potentially incriminating testimony if defense counsel, by confining himself to the facts of the instant case, should fail to do so.

It might have been that Solomont's testimony would have proved dangerous to the defendant. But, the choice was his to make, free from unnecessary hindrance by the Commonwealth. See *Commonwealth* v. *Johnson*, 365 Mass. 534, 543, 547 (1974). We do not question the need for and the reliance upon informants in effective law enforcement. Here, however, Solomont's role appears to have involved far more than supplying information or making an introduction. The Commonwealth sought and benefited from her assistance. It should not now be allowed to shelter her activities from consideration by a jury by threatening her with prosecution.

Although the defendant does not have an absolute right to Solomont's testimony, any restrictions placed upon his ability to present an effective defense must be based upon legitimate needs. In the peculiar circumstances of this case, we conclude that there is grave question whether the defendant received a fair trial, and his convictions must be reversed. "It is the duty of a prosecuting attorney to treat an accused person with judicial fairness. It is just as much his obligation to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *People* v. *Harris*, 182 Misc. 787, 800 (N.Y. Sup. Ct. 1944), citing *Berger* v. *United States*, 295 U.S. 78 (1935). At any retrial of the defendant, Solomont is to be produced by the Commonwealth upon the defendant's request. Should she resist any request for her testimony, the validity of her assertion of the privilege should be determined consistent with this opinion and the cases herein cited.

Accordingly, the judgments are reversed, the verdicts set aside, and the matter is remanded to the Superior Court for any further proceedings which the Commonwealth, in the exercise of its prosecutorial discretion, should seek to pursue.

*So ordered.*

BROWN, J. (concurring). I am in full accord with the reasoning and result reached by the majority. I am *compelled*, however, to state again in the strongest and most emphatic manner I can muster that the Commonwealth "must take care to behave itself." *Commonwealth* v. *Mencoboni*, 28 Mass. App. Ct. 504, 508 (1990) (Brown, J., dissenting), quoting from *Commonwealth* v. *Felton*, 16 Mass. App. Ct. 63, 66 (1983). See *Commonwealth* v. *Tirrell*, 382 Mass. 502, 513 (1981) (Kaplan, J., dissenting). The Commonwealth's conduct here was not only unfair, it was outrageous. This was not a momentary misstep but a persistent course of conduct designed to prejudice the defendant. Defense counsel was absolutely correct when he argued that it was "fundamentally unfair for the Commonwealth to use a person

. . . as an agent for the purpose of investigating crime, and then try to insulate an essential witness to the defense . . . . They can't have it both ways." Moreover, the Commonwealth cannot (and should not even to attempt to) argue that there could be any legitimate reason for its interference with access to a witness, particularly this witness, and in this particular circumstance. This rush to a Pyrrhic victory is particularly puzzling in view of the success which the prosecutor's colleague from the same office obtained by following an entirely proper (and laudable) course with the same witness in the *Quirk* case just a few days earlier.

The "fair trial" issue, aside, I also find only pain in the Commonwealth's blatant invasion of the defendant's right to counsel under the Sixth Amendment to the Federal Constitution. Cf. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 692 (1975). I cannot fathom why the prosecutor would "remain[] on the line while defense counsel spoke with" this *difficult* witness. Cf. *Commonwealth* v. *Manning*, 373 Mass. 438, 443-445 (1977).

Judges do not like slick. And this is too slick for this court.

I also am compelled, if I may be indulged, to repeat one more time: If prosecutors are unwilling or unable to adhere to the canons and disciplinary rules, as well as simple notions of fairness, "they should turn in their tickets." *Commonwealth* v. *Young*, 22 Mass. App. Ct. 452, 457 n.1 (1986) (Brown, J., concurring). In any event, at the very least, see suggestion in *Commonwealth* v. *Kozec*, 21 Mass. App. Ct. 355, 367 n.2 (Brown, J., concurring).